Filed 12/16/15  Shook v. LaFarre CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOSEPHINE SHOOK, an Incompetent Person, etc., et al., <br><br>     Plaintiffs and Respondents, <br><br> v. <br><br> CYRUS LAFARRE, <br><br>     Defendant and Appellant. | A142993 <br><br> (San Mateo County <br>  Super. Ct. No. CIV524311) |

      This is an appeal from judgment after a jury found defendant Cyrus LaFarre liable for financial elder abuse and breach of fiduciary duty against Rudolph Cook, the deceased brother of plaintiff Josephine Shook[1] and uncle of plaintiff Virginia Williamson.  LaFarre challenges the judgment on grounds that include improper jury instruction on the burden of proving undue influence, erroneous admission of evidence, lack of substantial evidence that LaFarre was a fiduciary or care custodian with respect to Cook, and erroneous grant of plaintiffs' motion to advance the trial in this case ahead of an already-scheduled trial in Cook's probate proceedings.  For reasons stated below, we affirm.

---

[1]    On September 26, 2013 a petition and order appointing guardian ad litem Virginia Lee Williamson for Josephine Shook was filed in San Mateo County Superior Court.

# FACTUAL AND PROCEDURAL BACKGROUND

On March 15, 2013, Cook passed away at age 89 in his San Francisco home while under hospice care.[2] Cook, born in Ohio, moved to San Francisco in his youth. Cook had seven siblings, none of whom lived in California, and all but one of whom (plaintiff Shook) predeceased him. Cook never married and had no children, but lived in his home on Lunado Way for over 38 years with his life partner, Richard Pence, who passed away in 2012. Defendant LaFarre moved into the house across the street from Cook and Pence in 2003, with his wife and two young daughters.[3] LaFarre cared for Cook before his death and was with him when he passed away.

Upon his death, Cook left behind a trust, dated August 1, 2012, that was an amended version of his original trust, dated February 20, 2001 (hereinafter, the amended trust or 2012 amended trust). Pursuant to this amended trust, Cook designated LaFarre as his trustee and primary beneficiary, and his longtime friend, Joanne Chevrette, as alternate trustee and beneficiary of a $75,000 gift. This amended trust differed from Cook's original trust in several ways. Most significant for our purposes, the original trust designated Chevrette as trustee, with his nephews, Thomas Cook and Kenneth Cook, as alternate trustees. Further, after making charitable gifts to designated organizations, the original trust provided that all remaining trust assets would be distributed equally among Cook's seven siblings or their living issue. The amended trust, to the contrary, named LaFarre as sole beneficiary of remaining trust assets after outright gifts of $75,000 were made to Joanne Chevrette and four of Cook's relatives (to wit, plaintiffs Williamson and Shook, and nephews Thomas Cook and Kenneth Cook).[4] Thus, as a result of these

---

[2] Unless otherwise stated, all statutory citations herein are to the Welfare and Institutions Code.

[3] LaFarre and his first wife are divorced, and he has since remarried.

[4] The charitable gifts set forth in the original trust were: (1) Cleveland Orchestra Heritage Society ($100,000); (2) San Francisco Opera ($25,000); (3) San Francisco Symphony ($25,000); and (4) San Francisco Opera Super Committee ($10,000). In the amended trust, these charitable gifts remained the same with one exception: the gift to Cleveland Orchestra Heritage Society was reduced to $75,000.

amendments, LaFarre, not named in the original trust, was to receive nearly $1.5 million from Cook's estate that otherwise would have gone to Cook's family members.

After learning of the amended trust, plaintiff, Cook's 92 year-old sister, by and through her guardian *ad litem*, plaintiff Williamson, filed this civil lawsuit, asserting causes of action for financial elder abuse under the Elder Abuse and Dependant Adult Protection Act, section 15600 et seq., and breach of fiduciary duty. Williamson, who is Shook's daughter and Cook's niece, was also named as individual plaintiff in this lawsuit. Together, plaintiffs sought compensatory and punitive damages, as well as other forms of relief.[5]

After extensive discovery, a jury trial commenced March 18, 2014. Over 30 witnesses were ultimately called, revealing the following evidence.

## I.    Plaintiffs' Case.

Chevrette, designated in the amended trust as alternate trustee and beneficiary of a $75,000 gift from Cook, testified that she did not believe Cook intended to make this gift to her. To the contrary, Cook had mentioned to her numerous times over the years that he intended for her to serve as trustee of his estate. She further testified that Cook never mentioned to her in their frequent interactions that he amended his trust and, in fact, told her the opposite after the purported amended trust was made. Specifically, according to Chevrette, Cook told her on March 2, 2013, just before he died, that she was named as his trustee. According to Chevrette, even after reviewing the 2012 amended trust, she "never believed" Cook instructed his attorney to make these changes.

Another longtime friend, Karen Bird, Cook's employer at California Saw and Knife for over 40 years, testified that, in the fall of 2012, she spoke to Cook about who would handle his affairs should something happen to him. Cook responded that an "old

---

[5]    In addition to this civil lawsuit, a legal challenge to the validity of the amended trust has also been filed in probate court. This probate matter, by which removal of LaFarre as trustee is also sought, was originally set for trial on February 24, 2014. However, the probate court vacated this trial date in light of LaFarre's failure to timely submit an accounting.

family friend" named Joanne Chevrette would be his trustee, and told Bird he would give her Chevrette's contact information next time they met. Bird next saw Cook at a January 2013 shareholder meeting, at which time he gave her a piece of paper with Chevrette's contact information that identified her as trustee of his estate.

Consistent with Chevrette's and Bird's testimony, Virginia Williamson, Cook's niece, testified that her uncle told her in mid-February 2013 to contact Chevrette because she was his trustee and would need Williamson's help to distribute his estate among family members after he died. Williamson also produced a handwritten note from Cook, given to her at this February meeting that had Chevrette's contact information.

Similarly, Julie Lenhardt, the former girlfriend of Cook's great nephew who visited Cook several times in that capacity, testified that she recalled a conversation with Cook shortly after Pence's death during which Cook described his own estate plans as "iron clad." Specifically, Cook told Lenhardt his executor would be Chevrette, his estate would be divided among his living siblings or their issue, and several organizations would receive charitable gifts.

Finally, Dr. Marvin Firestone, an expert in neuropsychiatry, testified that, during the summer of 2012, when the trust amendments were made, Cook was "dependent as well as debilitated and depressed." In addition to the emotional toll of having recently lost his life partner, Cook had experienced several "unconscious episodes" requiring multiple trips to the hospital. According to Dr. Firestone, these emotional and physical strains would have impacted Cook's ability to withstand undue influence by others, particularly those he relied upon for care.

## II.    Defendant's Case.

LaFarre became friends with Cook and Pence shortly after moving to a nearby house on Lunado Way in 2003. LaFarre's two young daughters were also close to Cook. For a time after LaFarre and his first wife separated, Cook facilitated the custody exchanges of their two minor daughters. Among other things, Cook shared numerous meals and holidays, including birthdays, with LaFarre and his family. Once, Cook gave LaFarre a card stating: "You are my son!" LaFarre described Cook as an exceedingly

4

generous person, often making gifts, including cash gifts and loans, to friends and relatives. In fact, both LaFarre and Chevrette were recipients of several such gifts over the years.

LaFarre spent much time with Cook during the last months of his life, and was with him when he died. Afterward, LaFarre helped Chevrette clean out Cook's house. On March 17, 2013, when he was cleaning out Cook's house by moving a trash bin full of papers to the curb for scavenger pickup, some of the papers spilled out. A collection of folded, cream-colored papers caught LaFarre's attention. Upon taking a closer look, LaFarre realized these papers were Cook's 2012 amended trust and a revised schedule A. LaFarre had no idea who placed these papers in the bin; however, he called Chevrette and requested that she return to the house with the 2001 trust documents from Cook that she possessed. She complied on March 19, 2014. Upon comparing the two sets of documents, Chevrette told LaFarre: "I guess you are in the driver's seat now."

DeWayne Byrd, a hospice worker who spent several of Cook's last days with Cook, testified at trial that, on March 13, 14 and 15, 2013, Chevrette and other individuals were at Cook's house, throwing away massive amounts of papers over Cook's protestations. Byrd described a large debris box set up outside Cook's home into which Chevrette and the others were throwing Cook's papers. However, while Byrd insisted he was "quite certain" this large debris box was at Cook's home on March 14, Greg Wilhelm, owner of Green Hauling, testified that the debris box delivered to Cook's residence was picked up on March 12, 2013. In addition, Chevrette testified that she made sure the debris box, which was delivered to Cook's home during his last hospitalization, was removed before Cook returned home for hospice care because she did not want its presence to upset Cook.

LaFarre also claimed to have later found among Cook's papers a type-written letter, dated February 17, 2013, from Cook to his close friend, Kim Freiberg. This letter, which was never sent, mentioned the tension that arose among Pence's relatives after his death over Pence's estate, and also expressed Cook's unhappiness with certain of his own

relatives, including Williamson, who, according to the letter, was being "pushy" about his own estate plans.[6]

In addition, LaFarre produced a letter prepared on a computer, dated July 10, 2012 and signed by Cook, to David Hill, the attorney who drafted his 2001 trust. This letter instructed Hill to prepare a new trust with several key changes from the 2001 trust, including the removal of his siblings as beneficiaries and the designation of LaFarre as executor and beneficiary of the balance of the trust once specified gifts were made. This was the only document produced at trial drafted by Cook on a computer rather than by hand or by old-fashioned typewriter.

At trial, Hill confirmed receiving Cook's July 10, 2012, letter, and also talking to him on the telephone before preparing the 2012 amended trust and other documents (including a codicil, a durable power of attorney naming LaFarre and Chevrette, and an advanced health care directive naming LaFarre and Chevrette). According to Hill, he questioned Cook on the telephone as to why he wanted to leave the bulk of his estate to LaFarre, and suggested that perhaps a specific bequest to LaFarre would be better; however, Cook rejected this suggestion, telling Hill he "valued [Cyrus's] friendship more than that." Hill acknowledged, however, that he did not meet with Cook in person to discuss the proposed amendments, and he did not know whether anyone else was present during their call. Hill further testified there was nothing distinct about Cook's voice when they talked on the telephone, even though it was undisputed Cook, who underwent a laryngectomy and spoke with a voice box, had a quite distinctive voice.

Expert legal witness, Stevan Luzaich, subsequently testified for plaintiffs that a trust and estate attorney's failure to meet an elderly client in person to discuss proposed amendments, and to confirm the client was making the amendments while of sound mind and under no undue influence, would fall below minimal standards of professional care.

Deepti Nigam, a notary employed by the UPS Store, testified that, according to her log book, on August 1, 2012, she notarized four documents for an individual identified as

---

[6]     Freiberg, along with Cook, was a beneficiary of Pence's will.

Rudolph Cook: a will, durable power of attorney, schedule A, and advanced healthcare directive. Nigam acknowledged having no independent memory of meeting Cook or notarizing his documents, and could not say whether Cook had been alone at the time.

Dr. James Missett provided expert medical testimony on behalf of LaFarre that, in August 2012, there was no indication in the medical records he reviewed that Cook would subjugate his will to that of someone else. Dr. Missett further testified Cook was capable of making his own decisions as late as March 11, 2013, when he declined a feeding tube and requested hospice care. Dr. Missett provided no opinion as to whether Cook "possessed testamentary capacity to make the amendment."

Finally, several of Cook's and LaFarre's friends and neighbors testified on behalf of LaFarre. These witnesses largely confirmed LaFarre had a close relationship with Cook and provided much care to him during the last years of his life. None, however, had any knowledge of Cook amending his trust to designate LaFarre as trustee and principle beneficiary.

## III.    The Jury Verdict, Damages, and Post-Trial Motions.

Following the presentation of evidence, the jury found that LaFarre committed financial abuse of an elder and breach of fiduciary duty. In addition, the jury found that LaFarre failed to prove by clear and convincing evidence that the 2012 trust amendment was not the result of undue influence while he was acting as Cook's care custodian. Following a bifurcated bench trial on the issue of damages, the trial court awarded plaintiffs monetary damages in the amount of $169,622.95. The trial court also awarded attorney fees and costs to plaintiffs in the amount of $789,348.70. The trial court denied LaFarre's motion for new trial. This timely appeal followed.

### DISCUSSION

LaFarre raises the following issues for our review. (1) Was the jury properly instructed regarding the issue of whether he exerted undue influence on Cook while acting as his care custodian? (2) Did the trial court abuse its discretion in admitting evidence relating to the probate accounting prepared by LaFarre? (3) Was there

substantial evidence supporting the jury's findings that: (a) LaFarre was Cook's "care custodian" within the meaning of the Probate Code 21362, and (b) owed him a fiduciary duty? (4) Did the trial court abuse its discretion by granting plaintiffs' motion to advance trial ahead of the probate proceedings? We address each issue in turn below.

## I. Was the Jury Properly Instructed Regarding Undue Influence By a Care Custodian?

LaFarre contends it was prejudicial error to instruct the jury pursuant to Probate Code section 21380 that he, as Cook's "care custodian" (Prob. Code, § 21362, subd. (a)[7]), had the burden to prove by clear and convincing evidence that he *did not* exert undue influence. (See Prob. Code, § 86 [" 'Undue influence' has the same meaning as defined in Section 15610.70 of the Welfare and Institutions Code. It is the intent of the Legislature that this section supplement the common law meaning of undue influence without superseding or interfering with the operation of that law"].)[8] As LaFarre points

---

[7] Probate Code section 21362 provides in relevant part:

"(a) 'Care custodian' means a person who provides health or social services to a dependent adult, except that 'care custodian' does not include a person who provided services without remuneration if the person had a personal relationship with the dependent adult (1) at least 90 days before providing those services, (2) at least six months before the dependent adult's death, and (3) before the dependant adult was admitted to hospice care, if the dependent adult was admitted to hospice care. As used in this subdivision, 'remuneration' does not include the donative transfer at issue under this chapter or the reimbursement of expenses.

"(b) For the purposes of this section, 'health and social services' means services provided to a dependent adult because of the person's dependent condition, including, but not limited to, the administration of medicine, medical testing, wound care, assistance with hygiene, companionship, housekeeping, shopping, cooking, and assistance with finances."

[8] Section 15610.70 provides:

"(a) 'Undue influence' means excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity. In determining whether a result was produced by undue influence, all of the following shall be considered:

"(1) The vulnerability of the victim. Evidence of vulnerability may include, but is not limited to, incapacity, illness, disability, injury, age, education, impaired cognitive

out, in probate court, the judge, not the jury, decides whether undue influence was exerted on a dependant adult for purposes of Probate Code section 21380. (Prob. Code, § 8252, subd. (b) ["The court shall try and determine any contested issue of fact that affects the validity of the will"]; see also Prob. Code, § 21366, subd. (a).) Also in probate court, the party contesting the testamentary instrument has the burden to prove undue influence by a preponderance of the evidence unless there is a presumption of undue influence that operates to shift the burden of proof to the proponent to show the absence of undue influence. (Prob. Code, § 8252, subd. (a); *Estate of Auen* (1994) 30 Cal.App.4th 300, 308.) According to LaFarre, since the jury rather than the trial court was permitted to decide the issue of undue influence in his case, it was prejudicial error to give him the burden to prove lack of undue influence by clear and convincing evidence since the elder abuse statutes do not require such burden shifting or heightened standard of proof. LaFarre reasons: "That both the Elder Abuse claim under the Welfare and Institutions Code and the care custodian claim under the Probate Code use the same term 'undue

---

function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability.

"(2) The influencer's apparent authority. Evidence of apparent authority may include, but is not limited to, status as a fiduciary, family member, care provider, health care professional, legal professional, spiritual adviser, expert, or other qualification.

"(3) The actions or tactics used by the influencer. Evidence of actions or tactics used may include, but is not limited to, all of the following:

"(A) Controlling necessaries of life, medication, the victim's interactions with others, access to information, or sleep.

"(B) Use of affection, intimidation, or coercion.

"(C) Initiation of changes in personal or property rights, use of haste or secrecy in effecting those changes, effecting changes at inappropriate times and places, and claims of expertise in effecting changes.

"(4) The equity of the result. Evidence of the equity of the result may include, but is not limited to, the economic consequences to the victim, any divergence from the victim's prior intent or course of conduct or dealing, the relationship of the value conveyed to the value of any services or consideration received, or the appropriateness of the change in light of the length and nature of the relationship.

"(b) Evidence of an inequitable result, without more, is not sufficient to prove undue influence." (§ 15610.70; accord Civil Code, § 1575.)

influence' as an essential element necessarily resulted in the jury applying what is the wrong burden of proof at the wrong level of proof to the defendant on both claims."

Turning to the record at hand, LaFarre correctly notes the jury in this case was given three separate verdict forms: (1) the first verdict form relating to plaintiffs' financial elder abuse claim; (2) the second relating to their breach of fiduciary duty claim; (3) and the third relating to the factual issue of whether LaFarre exerted undue influence on Cook while acting as his "care custodian" within the meaning of Probate Code section 21380.

With respect to plaintiffs' first cause of action, the Elder Abuse and Dependant Adult Civil Protection Act (hereinafter, the Act) broadly defines financial abuse as occurring " 'when a person or entity . . . [¶] . . . [t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both' (§ 15610.30, subd. (a)(1), italics added) or 'by undue influence.' (§ 15610.30, subd. (a)(3).)" (*Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 478.) Further, "A taking is for a 'wrongful use' when a party 'knew or should have known that [its] conduct is likely to be harmful to the elder . . . adult.' " (§ 15610.30, subd. (b).) "For purposes of this section, a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder . . . adult *is deprived of any property right, including by means of an agreement*, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder." (§ 15610.30, subd. (c).)

Thus, in accordance with this statutory law, the jury in this case was instructed that LaFarre could be found liable for financial elder abuse if plaintiffs proved by a preponderance of the evidence each of the following:

"1.    That . . . LaFarre took/appropriated/obtained or retained . . . Cook's property;

"2.    That . . . Cook was 65 years of age or older at the time of the conduct;

"3.    That . . . LaFarre took/appropriated/obtained or retained the property for a wrongful use or with the intent to defraud or by undue influence;

"4.    That [plaintiff Shook] and/or . . . Cook was harmed; and

10

"5.    That . . . LaFarre's conduct was a substantial factor in causing that harm."

The jury was further instructed that, "One way Plaintiff can prove . . . LaFarre took/appropriated/obtained or retained the property for a wrongful use is by proving [he] knew or should have known that his conduct was likely to be harmful to [plaintiff] or . . . Cook.  [¶] . . . LaFarre took/appropriated/obtained or retained property if [plaintiff] was deprived of the property by an agreement, gift, will or trust."

LaFarre does not directly challenge the correctness of these instructions, or the jury's subsequent finding that he committed financial elder abuse against Cook.  Nor could he.  These instructions accurately reflect the law, and the jury's subsequent verdict finds ample evidentiary support in the record.  For example, Joanne Chevrette, a close friend of Cook's for 37 years and named as trustee under his 2001 trust, testified against her own interests that she did not believe Cook intended to make a $75,000 gift to her, as provided for in the amended trust.  She further testified that Cook never mentioned to her that he amended his trust and, in fact, told her the opposite after the purported amendments were made — to wit, Cook told Chevrette on March 2, 2013, just before he died, that she was designated as his trustee, a statement he likewise made to another longtime friend, Karen Bird, in January 2013.[9]  Similarly, Virginia Williamson testified that her uncle told her in mid-February 2013 to contact Chevrette because she was his trustee and would need help to distribute his estate among family members.  This evidence, without a doubt, constitutes substantial evidence of financial elder abuse. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767-768  [testimony from a single witness may constitute substantial evidence]; see also *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1354-1355 ["while pressure must be brought to bear directly on the testamentary act, the pressure, or undue influence, may be established by circumstantial evidence"].)

---

[9]    Bird, like Chevrette, testified for plaintiff at trial.  Bird, who was Cook's employer for over 40 years, described meeting Cook in person in January 2013, at which time he told her Chevrette would be trustee and gave her a piece of paper with Chevrette's contact information.

Compared to the credible testimony of these witnesses, there were evident holes in LaFarre's account of "finding" Cook's amended trust. According to LaFarre, he found this instrument in a trash bag after Cook's death while cleaning and organizing Cook's house. LaFarre insisted, however, that Cook never mentioned to him (or to anyone else) having amended his trust, much less having designated LaFarre as trustee. Moreover, this instrument, which LaFarre gave to Chevrette after she told him she had scheduled a meeting with her attorney, was missing a key page – to wit, the page identifying Cook's intended gift recipients (including Chevrette).

Further, Hill, the attorney who prepared the amended trust admitted that he never met with Cook in person to discuss the amendments, and did not recall that Cook had a distinctive voice when they talked by telephone. Yet, it was undisputed that Cook required a voice box to converse, which produced a quite distinctive sound. The jury had every right to disbelieve LaFarre's testimony, and we decline to second-guess this credibility finding on appeal. (See *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968 [reviewing court must defer to the trier of fact's credibility determinations].)

Given this record, we conclude the judgment may be affirmed based on the financial elder abuse verdict alone: " 'If the *decision* of a lower court is correct on any theory of law applicable to the case, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the lower court reached its conclusion.' [Citation.] 'No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" (*David v. Hermann* (2005) 129 Cal.App.4th 672, 685.) However, because LaFarre insists the jury's financial elder abuse verdict was somehow tainted by its confusion with respect to the instructions provided with respect to the separate factual issue of whether LaFarre exerted undue influence while acting as Cook's "care custodian," we briefly address this issue. In doing so, we keep in mind that a challenge on appeal to the propriety of a jury

instruction is a question of law subject to de novo review. (*Miller v. Weitzen* (2005) 133 Cal.App.4th 732, 736, fn. 3.) Moreover, a jury charge must be assessed on appeal based upon the entirety of the charge rather than a single instruction. (*People v. Frye* (1998) 18 Cal.4th 894, 957; see also *People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258 ["Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation"].)

Relevant to this challenge, the jury was specially instructed pursuant to Probate Code section 21380 that: "A provision of a trust providing benefits to a care custodian of a donor who is a senior citizen is presumed to be the product of undue influence if the instrument was executed during the period in which the care custodian provided services to the transferor, or within 90 days before or after that period. [¶] The presumption created by this section is a presumption affecting the burden of proof. A care custodian may rebut this presumption by proving, by clear and convincing evidence, that the donative transfer was not the product of undue influence."

Again, LaFarre does not challenge the substance of these instructions. He thus implicitly acknowledges the general presumption under California law that a defendant named in an instrument as the recipient of a donative transfer exerted undue influence on the donor if, at the time (or within 90 days) of the instrument's execution, the defendant was acting as the donor's care custodian. He also concedes that this presumption operates to impose upon the defendant the burden to prove by clear and convincing evidence the absence of undue influence. LaFarre argues, however, that this issue should have been decided by the trial court rather than the jury, and that the verdict was likely the product of jury confusion, given that, with respect to the financial elder abuse verdict form, the jury was instructed that *plaintiff* had the burden to prove abuse (which abuse could or could not include undue influence) by a preponderance of the evidence.

We acknowledge that, pursuant to Probate Code section 8252, subdivision (b), "The court shall try and determine any contested issue of fact that affects the validity of the will." However, neither party has directed us to any legal authority, nor do we know of any, prohibiting a jury from deciding the issue of undue influence by a care custodian

13

in a civil case, such as this one, for elder abuse.  Moreover, the case law suggests otherwise.  (See *Heiser v. Superior Court* (1979) 88 Cal.App.3d 276, 280, citing *Estate of Beach* (1975) 15 Cal.3d 623, 643 ["jury trials are not available in probate proceedings when such would risk undermining the probate court's supervisorial responsibilities or when the issue resembles an accounting wherein it is impractical for a jury to wade through a mass of figures. Jury trials are appropriate however when the issues involve such things as standard of conduct, mental capacity [citations], or credibility of witnesses"].)

In any event, there is no basis on this record for presuming the trier of fact's finding of undue influence by a care custodian was the product of confusion, or otherwise prejudicial error for several different reasons.  First, LaFarre's argument disregards that the law requires us to presume the jury, composed of sensible men and women from the community, is capable of discharging its duty to follow the law as set forth in the court's instructions.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148-1149.)  Moreover, this presumption that the jury competently discharged its legal duty exists even where, as here, the jury is told to apply one burden of proof to one issue of fact and another burden of proof to a separate issue.  (*People v. Reliford* (2003) 29 Cal.4th 1007, 1016 [" 'we will presume here that jurors can grasp their duty—as stated in the instructions—to apply the preponderance-of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations' "].)  Thus, reviewing the instructions as a whole and assuming, as we must, that the jurors were fully capable of understanding and correlating the instructions (*People v. Guerra, supra,* 37 Cal.4th at pp. 1148-1149), there is no reasonable likelihood in this case the instructions relating to undue influence by a care custodian resulted in a verdict against LaFarre on the distinct financial elder abuse claim.[10]

---

[10]     LaFarre insists "[t]wo conflicting instructions on the same term ('undue influence') could have only caused, not dispelled, jury confusion."  However, the jury instructions made clear that a verdict against LaFarre on the financial elder abuse claim did not require a finding of undue influence.  (§ 15610.30.)  Moreover, LaFarre's

14

Second, even assuming for the sake of argument that the jury was confused by the burden-shifting instruction set forth in the third verdict form, or by its more stringent evidentiary standard, the fact remains that plaintiffs made an affirmative showing of undue influence at trial, notwithstanding the presumption arising under Probate Code section 21380. For example, plaintiffs presented substantial evidence, including expert testimony, that Cook was depressed and frail at the time of the 2012 trust amendments due to several recent significant losses in his life, including the death of his life partner, and due to his failing health. According to Dr. Marvin Firestone, an expert in neuropsychiatry, these emotional and physical strains would have impacted Cook's ability to withstand undue influence by others, particularly those he relied upon for care. In addition, there was evidence LaFarre, who had received large loans from Cook in the past on very favorable (if not unfair) terms, had been under significant financial stress for some time when the purported trust amendments were made, circumstantial evidence of his motivation for pressuring Cook to transfer property to him.[11] Among other things, on January 9, 2013, a judgment was recorded on LaFarre's home by the State of California. In addition, it appears LaFarre had lost a significant amount of money in one or more risky business ventures.

Moreover, there was evidence from plaintiffs that LaFarre was being compensated for helping Cook take care of his personal and medical needs around the time of the purported trust amendment, another legal requirement for finding a defendant liable as a care custodian. (Prob. Code, § 21362, subd. (a).) Three witnesses, Virginia Williamson, Dr. Eric Williamson and Gary Williamson, testified that Cook told them LaFarre was being paid for providing care to him. In addition, as mentioned above, there was evidence LaFarre and his wife received loans from Cook in the summer of 2012 totaling $170,000, with no security and minimal interest, at least one of which appears to have

argument that the jury misunderstood or misapplied the appropriate legal standard is speculative. He makes no affirmative showing whatsoever of jury confusion or error.

[11] LaFarre and his wife also borrowed about $170,000 from Cook in June and August 2012, when Cook was 89 years old and was twice hospitalized.

15

been forgiven. Finally, there was evidence that LaFarre, after becoming trustee of Cook's estate, paid himself generous fees from the trust for his services, including $77,000 for services rendered between mid-March 2013 and November 2013.

Thus, on this record, even without giving plaintiffs the benefit of the statutory presumption, the jury's finding that LaFarre exerted undue influence on Cook while acting as his care custodian was amply supported by the evidence. (See, e.g., *In re Gregory A*. (2005) 126 Cal.App.4th 1554, 1562 [where clear and convincing evidence is required, the standard of review is whether the record contains substantial evidence from which the trier of fact could find clear and convincing evidence of the underlying fact]; see also *Lintz v. Lintz, supra,* 222 Cal.App.4th at pp. 1354-1355 [undue influence may be established by circumstantial evidence].) Accordingly, whether or not there was instructional error with respect to which party had the burden of proof on this issue, for all the reasons stated, including the overall sufficiency of the evidence establishing that LaFarre committed financial elder abuse and undue influence as a care custodian, there was no prejudice from such error, even when assessed under the stringent federal constitutional standard of harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18; see *People v. Ayers* (2005) 125 Cal.App.4th 988, 998.) Under the totality of circumstances of this case, there is simply no basis for disturbing the trier of fact's well-supported verdicts in favor of plaintiffs and against LaFarre. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 851 [if a jury is instructed on two alternative theories of liability, one of which is legally sufficient and one of which is not, we will affirm unless the record affirmatively demonstrates the jury relied on the unsupported ground]; see also *In re Estate of Hansen* (1940) 38 Cal.App.2d 99, 117 [where there is substantial evidence to support the finding of a jury on any material issue, the jury's determination of that issue will be upheld on appeal].)

## II. Did The Trial Court Properly Admit Evidence Relating To The Accounting Submitted In Cook's Probate Case?

LaFarre next contends the trial court erred by admitting certain evidence of the accounting he submitted in probate court that, he says, was relevant in this civil case only

for the purpose of "attacking [his] character." This evidentiary challenge is, of course, reviewed only for abuse of discretion. (*Donlen v. Ford Motor Co*. (2013) 217 Cal.App.4th 138, 148 [trial courts have broad discretion to determine the relevancy of evidence].)

We conclude LaFarre has failed in his burden to prove any such abuse of discretion. The trial court admitted these documents as relevant to plaintiffs' theory that LaFarre targeted Cook and sought to take control of his estate as a way to alleviate his own financial concerns. This ruling, wholly reasonable in light of the record created at trial, was within the proper scope of the court's discretion. (Evid. Code, § 210 [" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].) The ruling thus stands.

### III. Does Substantial Evidence Support The Jury's Findings That Lafarre Was a "Care Custodian" and Fiduciary With Respect To Cook?

LaFarre also contends the jury's findings that he was Cook's care custodian and owed him a fiduciary duty are not supported by substantial evidence. "When determining whether there is sufficient evidence to support the trial court's finding of [fact], we follow established rules of appellate review: We view factual matters most favorably to the prevailing party and in support of the judgment. We defer issues of credibility to the trier of fact. Additionally, we resolve all conflicts in the evidence in favor of the respondents. [Citation.] Our power 'begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion' reached by the trier of fact. [Citation.]" (*Estate of Auen, supra*, 30 Cal.App.4th at p. 311.) More specifically, "In viewing the evidence, we look only to the evidence supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. [Citation.] Where the trial court or jury has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different

17

inferences may also be reasonable. [Citation.] The trier of fact is not required to believe even uncontradicted testimony." (*Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 241.)

Having reviewed this record, we conclude there is indeed substantial evidence supporting the jury's finding that LaFarre was acting as Cook's care custodian at the time he financially abused him. In fact, much of this evidence has already been discussed. We thus only briefly summarize it here. First, LaFarre himself acknowledged that he regularly provided Cook transportation to medical appointments and to the YMCA (among other places), regularly took his trash cans to the curb for pickup, and regularly cooked meals for him. In addition, there was evidence LaFarre received compensation for these services, including testimony from the Williamsons that Cook told them as much. And there was evidence of favorable loans Cook provided LaFarre and his wife (one of which LaFarre acknowledged never fully repaying).[12] Finally, there was evidence Cook qualified as a dependent adult at the time LaFarre rendered these services to him, including testimony from medical experts that Cook's mental and physical health were in significant decline, making him susceptible to undue influence. No further evidentiary showing was required under California law. (See Prob. Code, § 21362 [a "care custodian" is one who provides "health and social services," meaning "services provided to a dependent adult because of the person's dependent condition, including, but not limited to, . . . assistance with hygiene, companionship, housekeeping, shopping, cooking, and assistance with finances"]; Prob. Code, § 21366, subd. (a) [a "dependant adult" is one who is: "65 years of age or older and satisfied one or both of the following criteria: [¶] (1) The person was unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter. [¶] (2) Due to one or more deficits in the mental functions [see Prob. Code, § 811, subd. (a)(1)-(4)] . . . the person had difficulty managing his or her own financial resources or resisting fraud or undue influence"].)

---

[12]     LaFarre argues these types of loans are not the type of payment for services contemplated under Probate Code section 21380. However, he offers no legal authority for his argument, and we reject it.

Much of this same evidence relating to LaFarre's regular provision of health and human services to Cook during a time in which Cook was becoming increasingly dependent on others for his daily needs also supports the jury's finding that LaFarre owed Cook a fiduciary duty.[13]  As one well-known treatise aptly explains:  "Those who oversee the day-to-day needs of the aged in facilities for their care, and whom the aged perceive as controlling their continued peaceful enjoyment of the care and comfort they receive, are in a confidential and controlling relationship."  (79 Am.Jur.2d Wills, § 367; see also *Stevens v. Marco* (1956) 147 Cal.App.2d 357, 374 ["this rule [of fiduciary obligation] does not apply merely to those who bear a formal relation of trust to those with whom they deal — not only to attorneys, physicians, trustees, clergymen, kinsmen, *and others who by the very force of their occupations or relationship are presumed to be in the class of persons bound to act with the utmost good faith. It applies in every case where there has been a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding*"].)  Applying this legal standard here, we conclude no further evidentiary showing was required by plaintiffs.  Accordingly, the jury's findings must stand.

## IV.    Did The Trial Court Properly Grant Plaintiffs' Motion To Advance Trial?

Finally, LaFarre challenges as an abuse of discretion the trial court's grant of plaintiffs' request to proceed to trial in this case in advance of the pending trial in probate

---

[13]    The jury was instructed as follows with respect to plaintiff's cause of action for breach of fiduciary duty:  "A fiduciary relationship is created where a confidence is reposed by one person in the integrity of another and the party in whom the confidence is reposed voluntarily accepts or assumes to accept the confidence.  A fiduciary duty imposes on that person a duty to act with the utmost good faith in the best interest of the person in his or her care and that person can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent.  A fiduciary relationship is founded upon the trust or confidence reposed by one person in the integrity and fidelity of another, and precludes the idea of profit or advantage resulting from the dealings of the parties and the person in whom the confidence is reposed."  LaFarre has not challenged the validity of this instruction.

court to determine the validity of Cook's amended trust. This request was made in light of Ms. Shook's advanced age (92 years old) and serious medical infirmities.

In response to LaFarre's arguments in his opening brief, plaintiffs have submitted to this court a request for judicial notice of an official trial court order, dated January 30, 2014, establishing that the original trial date in probate court of February 24, 2014, was in fact vacated *sua sponte* by the probate court judge because LaFarre had failed to file a timely accounting. We agree with plaintiffs this undisputed fact undermines LaFarre's claim that the trial court here abused its discretion by proceeding to trial on their civil claims before resolution of the related probate matter. We thus grant plaintiffs' request for judicial notice of this record (Evid. Code, § 452, subds. (c), (d)), and reject LaFarre's final contention.

## DISPOSITION

The judgment is affirmed. Plaintiffs shall recover costs on appeal.

_____
Jenkins, J.

We concur:

_____
Pollak, Acting P. J.

_____
Siggins, J.

*Josephine Shook, an Incompetent Person, etc., et al.*, *v. Cyrus LaFarre*, A142993